IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TRISTRATA TECHNOLOGY, INC.,            :
                                       :
          Plaintiff,                   :
                                       :
     v.                                :   Civil Action No. 01-127-JJF
                                       :
MARY KAY, INC.                         :
                                       :
          Defendant.                   :

---

Arthur G. Connolly, III, Esquire and Francis DiGiovanni, Esquire
of CONNOLLY, BOVE, LODGE & HUTZ LLP, Wilmington, Delaware.
Of Counsel: Michael V. Ciresi, Esquire, Jan M. Conlin, Esquire,
and Tara Falsani Harkins, Esquire of ROBINS, KAPLAN, MILLER &
CIRESI L.L.P., Minneapolis, Minnesota and Kevin M. McGovern,
Esquire, and Brian T. Foley, Esquire of MCGOVERN & ASSOCIATES,
New York, New York.
Attorneys for Plaintiff.

Rodger D. Smith II, Esquire of MORRIS, NICHOLS, ARSHT & TUNNEL,
Wilmington, Delaware.
Of Counsel:  Roy W. Hardin, Esquire and Charles E. Phipps,
Esquire of LOCKE LIDDELL & SAPP LLP, Dallas, Texas.
Attorneys for Defendant.

---

**MEMORANDUM OPINION**

March 31, 2006
Wilmington, Delaware

Farnan, District Judge.

Pending before the Court are five motions.  Plaintiff,
Tristrata Technology, Inc. ("Tristrata") has filed two motions:
Plaintiff's Motion For Permanent Injunction (D.I. 307) and
Plaintiff's Motion For Entry Of Final Judgment (D.I. 309).
Defendant Mary Kay, Inc. ("Mary Kay") has filed three motions:
Mary Kay's Rule 50(a) Motion For Judgment As A Matter Of Law At
The Close Of All The Evidence (D.I. 290), Mary Kay's Rule 50(b)
Post-Trial Motion For Judgment As A Matter Of Law (D.I. 324), and
Mary Kay's Rule 59 Motion For New Trial Filed As An Alternative
To Its Renewed Motion For Judgment As A Matter Of Law (D.I. 322).
For the reasons discussed, the Court will grant Tristrata's
Motions and deny Mary Kay's Motions.

**BACKGROUND**

Tristrata filed this patent infringement action, alleging
that Mary Kay contributorily and by inducement infringed U.S.
Patent Nos. 5,091,171 (the "'171 patent"), 5,422,370 (the "'370
patent"), and 5,547,988 (the "'988 patent") by manufacturing and
marketing certain skin care products containing alpha
hydroxyacids ("AHAs").  Each of the patents-in-suit claims a
method of treating wrinkles and other skin conditions by the
regular, topical, application of AHAs in various formulations.
The Court held a jury trial in this matter and the jury returned
a verdict, finding that Mary Kay had contributorily infringed the

1

patents-in-suit and induced infringement of the patents-in-suit.
The jury did not find that Mary Kay's infringement was willful.
On the issue of validity, the jury found that Mary Kay had not
proved that the patents-in-suit were invalid on grounds of
anticipation, obviousness or non-enablement.  The jury further
found that Tristrata was entitled to a reasonable royalty rate of
6.5% and awarded total damages of $26,359,405.

    At the close of all of the evidence, Mary Kay moved for
judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a).
(D.I. 290.)  Following the jury's verdict, Mary Kay renewed its
motion for judgment as a matter of law (D.I. 324) and also moved,
in the alternative, for a new trial (D.I. 322).  Tristrata moved
for a permanent injunction, enjoining Mary Kay from further
infringements of the patents-in-suit (D.I. 307), and for entry of
final judgment (D.I. 309).

**DISCUSSION**

**I.  Mary Kay's Motions For Judgment As A Matter Of Law (D.I. 290
    & 324)**

    A.  <u>Legal Standard</u>

    A court may grant judgment as a matter of law when "there is
no legally sufficient evidentiary basis for a reasonable jury to
find for that party on that issue."  Fed. R. Civ. P. 50(a).  In
assessing the sufficiency of the evidence, a court must review
all of the evidence in the record, viewing it in the light most
favorable to the non-moving party and giving the non-moving party

the benefit of all fair and reasonable inferences that could be drawn from it.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000).  The court may not weigh the evidence, make credibility determinations, or substitute its version of the facts for the jury's version.  Id.  Motions for judgment as a matter of law are granted "sparingly" and only in those circumstances in which "the record is critically deficient of the minimum quantum of evidence in support of the verdict."  Johnson v. Campbell, 332 F.3d 199, 304 (3d Cir. 2003).  The question the Court must answer then, is "whether, viewing the evidence in the light most favorable to the verdict, a reasonable jury could have found for the prevailing party."  Id.

    B.  Whether The Jury Could Reasonably Find That Mary Kay
        Did Not Prove By Clear And Convincing Evidence That The
        Patents-In-Suit Are Invalid

    Mary Kay contends that it "proved as a matter of law by clear and convincing evidence that the method claims at issue in Tristrata's patents are invalid" because they lack enabling disclosures, they were anticipated by the prior art, and they were obvious to one of ordinary skill in the art at the time. (D.I. 325 at 6.)  "Anticipation is a factual determination that is reviewed for substantial evidence when decided by a jury."  Koito Mfg. Co., Ltd. V. Turn-Key-Tech, LLC, 381 F.3d 1142, 1149 (Fed. Cir. 2004) (citations omitted).  Obviousness and enablement are questions of law; however, the findings of fact underlying

3

conclusions on obviousness and enablement, "whether explicit or implicit within the verdict," are reviewed for substantial evidence.  Id.  Under 35 U.S.C. § 282, a patent is presumed valid, thus, a challenger must prove invalidity by clear and convincing evidence.  Perricone v. Medicis Pharmaceutical Corp., 432 F.3d 1368, 1372 (Fed. Cir. 2005) (citing Geneva Pharm. Inc. v. Glaxosmithkline PLC, 349 F.3d 1373, 1377 (Fed. Cir. 2003)).

The central factual question before the jury on the issue of enablement was whether a person skilled in the art could, given the specifications, practice the methods claimed without undue experimentation.[1]  See Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 941 (Fed. Cir. 1990).  Implicit in the jury's findings for Tristrata on enablement, (see D.I. 293 at 8-9), is a finding that Mary Kay did not prove by clear and convincing evidence that one skilled in the art could not practice the methods claimed without undue experimentation.  The question before the Court on this issue then, is whether there was sufficient evidence to support that finding.  The Court concludes that there was.

Mary Kay points to nothing in the record that supports its contention that it proved the patents-in-suit invalid for lack of

---

[1]In its Order (D.I. 224) denying Mary Kay's Motion For Summary Judgment Of Invalidity For Lack Of Enablement (D.I. 129), the Court concluded that this was a genuine issue of material fact for the jury.

4

enablement.  Instead it asserts that "[i]t is apparent from the
patents themselves that it would require undue experimentation to
create a product in which the AHAs in the product reach the
dermis and create the dermal biosynthesis required to practice
the claimed invention." (D.I. 325 at 7.)  However, Tristrata's
expert witness, Dr. Weiner, testified to his opinion that the
patent specifications would have enabled a person of ordinary
skill in the art to practice the method claimss.  (Tr. 283:1-12.)
Moreover, that opinion was supported by his explanation that,
although the claimed methods permit a wide range of
concentrations of AHAs, a person of ordinary skill in the art
would sufficiently understand the specifications' teachings with
respect to the relationship between the concentration of an AHA
in a formulation, the pH of the formulation, and the
bioavailability[2] of the AHA, to enable him to practice the
claimed methods with only routine experimentation.  (Tr. 253:6-
256:23.)  The Court concludes that this evidence was sufficient
to support the jury's findings on enablement.

Mary Kay also contends that four references offered at trial
anticipate the patents-in-suit:  the Eller and Wolff reference,
the Urkov article, the Livingston publication, and the Zizmor

_____

[2]Bioavailability refers to the degree to which an AHA is
able to penetrate the stratum corneum, the uppermost layer of the
epidermis, and reach the dermis, where it can effect changes in
the dermal structure.

5

book.  (D.I. 325 at 11.)  Mary Kay asserts that the testimony of

their witness, Dr. Draelos, concerning those prior art references

was uncontroverted.  (Id.)  However, Tristrata cross examined Dr.

Draelos with respect to each of the four references.  (Tr. 698:1-

700:25 (Zizmor); Tr. 706:20-711:15 (Livingston); Tr. 718:6-724:19

(Eller and Wolff); Tr. 733:8-734:10 (Urkov).)  In addition, each

of the four references was admitted into evidence.  The Court

concludes that Dr. Draelos's testimony under cross-examination

and the references themselves provided sufficient evidence from

which the jury could reasonably find that Mary Kay had not proved

by clear and convincing evidence that the patents-in-suit were

anticipated by prior art references.

Mary Kay relies on the same four prior art references to

support its contention that the patents-in-suit are invalid for

obviousness.  (D.I. 325 at 15.)  The Court again concludes that

Dr. Draelos's cross-examination testimony and the references

themselves provided sufficient evidentiary support for the jury's

findings.  In addition, as Tristrata points out, "the record is

replete" with evidence of secondary considerations of

nonobviousness.  (D.I. 327 at 24.)  Mary Kay's briefing does not

address those secondary considerations.

C.  <u>Whether There Was Sufficient Evidence From Which The
    Jury Could Reasonably Find That Mary Kay Infringed
    The Patents-In Suit</u>

   1.  <u>Whether Dr. Weiner's Testimony Was Scientifically
       Reliable</u>

Mary Kay contends that Dr. Weiner's testimony was

inadmissible because Tristrata failed to show that it was

scientifically reliable.  (D.I. 325 at 24.)  Dr. Weiner did not

base his opinions on independent testing of the accused Mary Kay

products, but rather on the results of tests conducted for Mary

Kay.  Mary Kay now argues that Dr. Weiner arrived at his opinions

by "divining dermal results from epidermal testing," (D.I. 325 at

21), and that Tristrata failed to demonstrate that this

"conversion of Mary Kay's test results into a different kind of

test results," (<u>Id.</u>), satisfied the scientific reliability

factors set forth by the Third Circuit in <u>In re Paoli R.R. Yard

PCB Litig.</u>, 35 F.3d 717 (3d Cir. 1993).

   The validity of this argument depends on Mary Kay's asserted

premise that the tests measured only epidermal effects.  That

premise is not supported by the record.  For example, one test

report states that one objective of the tests was to evaluate any

dermal irritation caused by the products, (PTX 11 at MK 09614),

and the report's conclusion speculates that dramatic changes

observed in wrinkle reduction might have been caused by changes

in dermal metabolism stimulated by the products, (<u>Id.</u> at MK

7

09260).  Moreover, Dr. Yeung, who monitored that and other tests,
acknowledged at various points in his deposition testimony that
the tests measured dermal as well as epidermal effects.  (D.I.
251 Ex. B, 74:18-75:2, 82:22-83:20, 130:21-132:9.)  Therefore,
Mary Kay's argument on this point must fail.

Mary Kay does not challenge the scientific reliability of
the test results themselves, only Dr. Weiner's interpretation of
those results.  Essentially, Mary Kay's objection is to the
substance of Dr. Weiner's opinions and not the methodology by
which he arrived at them.  The record demonstrates that Dr.
Weiner's education and experience provided him with sufficient
familiarity with the testing methods to qualify him to offer
expert opinion testimony on the test results.  Mary Kay had the
opportunity at trial to counter his opinions through the
appropriate means of "vigorous cross examination, presentation of
contrary evidence, and careful instruction on the burden of proof
. . . ."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596
(1993).  The fact that Mary Kay's efforts to do so were
unsuccessful does not justify excluding Dr. Weiner's opinions
now.

Mary Kay also contends that Dr. Weiner's testimony was not
scientifically reliable because Dr. Weiner based conclusions on a
review of the ingredients in the accused products.  Mary Kay
argues that Tristrata failed to demonstrate the reliability of

"studying a complex formula of ingredients in skin products and knowing which products are traveling where and causing what effects." (D.I. 325 at 22.) However, that argument mischaracterizes Dr. Weiner's testimony. (See Tr. 265:4-271:15.) The portion of Dr. Weiner's testimony that Mary Kay cites is actually a discussion of several ingredients with respect to what purpose they might serve in a formulation and what effects they could have on the formulation's ability to pass through the epidermis to the dermis. (Id.) Dr. Weiner did not testify, as Mary Kay asserts, that "the combination of ingredients alone in Mary Kay's products allowed him to determine that the AHA ingredient in Mary Kay's products was penetrating down into the dermal layer." (D.I. 325 at 21.)

Dr. Weiner has a Ph.D. in pharmaceutics and teaches physical pharmacy at the University of Michigan. He testified that his "expertise is in designing formulations that control where [in the skin] an ingredient in a formulation . . . will go." (Tr. 234:24-235:3.) He is well qualified to opine as an expert on the purposes and effects of the ingredients in the accused products.

Finally, Mary Kay contends that Dr. Weiner's testimony was scientifically unreliable because he failed to rule out explanations other than the dermal effects of AHAs for the skin improvements caused by the accused products. Contrary to Mary Kay's assertion, the admissibility of expert scientific testimony

9

does not depend upon whether the expert ruled out alternatives to his explanations.  Whether an expert has accounted for alternative explanations is a factor a court may consider in making the admissibility determination.  See e.g. In re Vioxx Products Liability Litig., 401 F.Supp.2d 565, 573 (E.D. La. 2005); Dreyer v. Ryder Automotive Carrier Group, Inc., 367 F.Supp.2d 413, 434 n.20 (W.D.N.Y. 2005).  It is not, however, a prerequisite to admissibility, and the cases cited by Mary Kay do not support the proposition that it is.  The Supreme Court has stated that a trial court's inquiry into the admissibility of expert testimony is "'a flexible one,'" and that no single factor will be determinative or even applicable in every case.  Kumho Tire Co., LTD v. Carmichael, 526 U.S. 137, 150 (1999) (quoting Daubert, 509 U.S. at 594).  Given the context of this case, in which the alternative explanations suggested by Mary Kay are not necessarily mutually exclusive of the explanation offered by Dr. Weiner, the Court concludes that Dr. Weiner was not required to rule out alternative explanations in order to render his testimony scientifically reliable.

> 2.  <u>Whether There Was Sufficient Evidence From Which The Jury Could Reasonably Find That The AHAs In Mary Kay's Accused Products Had A Dermal Effect</u>

Many of Mary Kay's arguments hinge on the contention that Tristrata offered insufficient evidence that the AHAs in the accused products penetrate to the dermal layer of the skin and

cause dermal changes that visibly reduce wrinkles.  Having reviewed all of the evidence offered at trial, the Court cannot agree with that contention.  Tristrata offered extensive evidence to that effect, including its direct examination of Dr. Weiner, (Tr. 234:14-371:21), the research reports from Mary Kay's testing of the accused products, (PTX 11, 12, 34, 64, 393), an excerpt of the deposition testimony of David Yeung, (Tr. 1221:7-1222:5), an excerpt of the deposition testimony of Dr. John Schiltz, (Tr. 122:10-1225:16), and the testimony on cross-examination of Dr. Melanie Smith, (Tr. 1218:6-18, 1236:12-1242:4).

Mary Kay also contends that there was insufficient evidence that the AHAs in the accused products were the principal ingredient that caused the skin improvements observed in the test results.  (D.I. 325 at 27.)  However, Mary Kay's own research reports provide sufficient evidence from which the jury could reasonably conclude otherwise.  For example, two of the reports have the project name "Treatment Regimens (Toners/Moisturizers) With Alpha-Hydroxy Acids."  (PTX 11, 12.)  Another has the project name "Treatment Creams With Alpha-Hydroxy Acids 1642A, 1642B, 1642C."  (PTX 393.)  The stated objective of one of the tests is "[t]o observe the efficacy of FIVE different treatment regimens containing Alpha Hydroxy Acid to improve the appearance and qualitative aspects of skin during an eight week usage period. . . ."  (PTX 12.)  Another stated objective is "[t]o

determine the efficacy of FOUR different treatment regimens containing Alpha Hydroxy Acid to improve the appearance and qualitative aspects of skin during a six week usage period. . . ." (PTX 393.)  This evidence, as well as the contents of the reports and Dr. Weiner's opinions on the test results, provided sufficient evidence from which the jury could reasonably find that what Mary Kay was testing was the effects of the AHAs in the accused products, and that AHAs were the principal ingredient causing the observed results.

That same evidence also refutes Mary Kay's contention that Tristrata offered insufficient evidence that the accused products containing retinoids or salicylic acid could have been used to infringe Tristrata's patents.  Because the jury could reasonably find that the AHAs in the accused products were the principal ingredient causing dermal changes, the presence of retinoids or salicylic acids in the products is immaterial

      3.  <u>Whether There Was Sufficient Evidence From Which</u>
          <u>The Jury Could Reasonably Find That Mary Kay</u>
          <u>Induced Infringement Of The Patents-In-Suit</u>

Mary Kay contends that Tristrata failed to offer sufficient evidence that Mary Kay induced consumers of the accused products to infringe the method claims of the patents-in-suit.  In order to prevail on a claim of inducement to infringe, a plaintiff must establish

      that the defendant possessed specific intent to
      encourage another's infringement and not merely that

12

the defendant had knowledge of the acts alleged to
constitute inducement.  The plaintiff has the burden of
showing that the alleged infringer's actions induced
infringing acts <u>and</u> that he knew or should have known
his actions would induce actual infringements.[3]

<u>Manville Sales Corp. v. Paramount Systems, Inc.</u>, 917 F.2d 544,

553 (Fed. Cir. 1990).  Mary Kay argues that there was

insufficient evidence that it encouraged consumers of its

products to infringe the method claims, that it knew or should

have known its actions would induce infringement, or that Mary

Kay's customers actually used its products in a way that

infringed the method claims.  (D.I. 325 at 32-33.)  The Court

concludes that there was sufficient evidence on each of these

points.

      With respect to whether Mary Kay encouraged its customers to

use its products in a way that infringed the method claims,

Tristrata introduced a substantial amount of Mary Kay's marketing

literature and product inserts.  (PTX 9, 17, 20, 21, 28, 45, 387,

390, 407, 408, 442-47.)  In general, these exhibits instruct

_____

      [3]As Mary Kay points out (D.I. 325 at 29), the Federal
Circuit has acknowledged that there is a "lack of clarity" with
regard to the level of intent required.  <u>MercExchange, LLC v.
eBay, Inc.</u>, 401 F.3d 1323 (Fed. Cir. 2005).  However, the jury
instruction given by the Court in this case (D.I. 292 at 15)
conformed to the standard set forth in <u>Manville</u>, which is
stricter than the alternate standard set forth in <u>Hewlett-Packard
Co. v. Bausch & Lomb, Inc.</u>, 909 F.2d 1464, 1469 (Fed. Cir. 1990)
(stating that "[p]roof of actual intent to cause the acts which
constitute the infringement is a necessary prerequisite to
finding active inducement").  Therefore, the "lack of clarity"
cited by Mary Kay has no effect in this case.

                                                              13

customers to apply the accused products on a regular basis to achieve improvements in, _inter alia_, signs of age, skin firmness and elasticity, sun-damaged skin, and fine lines and wrinkles. Tristrata also introduced exhibits summarizing the anti-aging indications, directions for frequency of use, formulation design, and clinical test results, provided in Mary Kay's marketing literature for each accused product.  (PTX 634-38.)   These exhibits, together with the testimony of Dr. Weiner, provided sufficient evidence from which the jury could reasonably conclude that Mary Kay encouraged or instructed its customers to use the products in a way that infringed the method claims.

With respect to whether Mary Kay knew or should have known that its actions would induce infringement, Tristrata introduced the research reports from Mary Kay's tests of the accused products.  (PTX 11, 12, 34, 64, 393.)   These, together with Dr. Weiner's testimony about their results, provided sufficient evidence from which the jury could reasonably conclude that Mary Kay knew or should have known that its marketing literature and product inserts would induce its customers to use its products in a way that infringed the method claims.

With respect to whether Mary Kay's customers actually used its products in a way that infringed the method claims, it was reasonable from the evidence introduced, for the jury to infer that Mary Kay's customers used the accused products in the manner

14

instructed by the product inserts.  It was also reasonable for the jury to infer that, by following those instructions, the customers obtained the same skin improvements that were observed in Mary Kay's product testing, and to find that those improvements resulted from the dermal effects of the AHAs in the products.

<blockquote>
4.  <u>Whether There Was Sufficient Evidence From Which The Jury Could Reasonably Find That Mary Kay Contributorily Infringed The Patents-In-Suit</u>
</blockquote>

Mary Kay contends that there was insufficient evidence to support the jury's verdict of contributory infringement.  (D.I. 325 at 35.)  The Court's jury instruction on contributory infringement, to which Mary Kay does not object, required Tristrata to prove that:

> 1.  The ingredient supplied by Mary Kay is a material part of the method claims and is not a staple article or commodity of commerce suitable for substantial non-infringing uses, but rather, the ingredient is especially made or especially adapted for use in an infringement of Tristrata's patent.  2.  Mary Kay knew of the '171, '370 and '988 patents and sold the accused ingredient knowing that the ingredient was especially made or especially adapted for use in an infringement of Tristrata's patent.  3.  Someone then bought the ingredient and actually used it in a way that infringes each limitation of an asserted claim of the '171, '370 and '988 patents.

(D.I. 292 at 17.)  Mary Kay argues that there was insufficient evidence that "the AHAs in Mary Kay's products were not suitable for substantial non-infringing uses," that Mary Kay's products were especially made or adapted for infringing the method claims

15

of the patents-in-suit, that Mary Kay had actual knowledge that the products were especially made or adapted for an infringing use, or that anyone actually used the products in an infringing manner.[4]  (D.I. 325 at 35-37.)  The Court concludes that there was sufficient evidence on each of these points.

Dr. Weiner's testimony, combined with the research reports on Mary Kay's product tests and Mary Kay's marketing literature and product inserts, provided sufficient evidence for the jury reasonably to find that Mary Kay especially adapted the AHAs in its products for infringing use by including them in a formulation that, if used as directed, infringed the method claims.  From that same evidence, the jury could reasonably find that Mary Kay knew that the AHAs in its products were especially adapted for infringing use.  As discussed above, it was reasonable for the jury to infer that customers who purchased Mary Kay's products used them as directed and achieved the same results as Mary Kay's test subjects.

D.   Whether There Was Sufficient Evidence From Which The Jury Could Reasonably Find That 6.5% Was A Reasonable Royalty

In its Motion For Judgment As A Matter Of Law At The Close Of All The Evidence (D.I. 290), Mary Kay contends that there was

---

[4]Mary Kay also argues that "[t]here is insufficient evidence that anyone purchased just the ingredient at issue in this case – AHAs – from Mary Kay."  (D.I. 325 at 36.)  Because Tristrata was not required to prove that, the Court will not address this argument.

insufficient evidence upon which a jury could find a reasonable
royalty rate of greater than six percent.  Mary Kay did not
address this argument in its post-verdict Motion (D.I. 325).  In
support of its contention, Mary Kay argues that the Court erred
in admitting evidence of a license agreement between Tristrata
and Tanning Research Laboratories (PTX 264), and that without
that, there was insufficient evidence for a royalty greater than
six percent.  (D.I. 290 at 13-15.)  Mary Kay correctly states
that, under Federal Rule of Evidence 408, a court should exclude
evidence of license agreements reached as a result of settlement
of litigation.  (Id. at 14.)  The licensee of the license at
issue, however, was not a party to relevant litigation at the
time the agreement was entered into. (Tr. 745:9-24.)  Therefore
evidence of the license was properly admitted, providing
sufficient support for the jury's finding of a reasonable royalty
rate of 6.5%.

**III.  Mary Kay's Motion For A New Trial (D.I. 322)**

    A.  <u>Legal Standard</u>

    A court may grant a new trial "to all or any of the parties
and on all or part of the issues. . . in an action in which there
has been a trial by jury, for any of the reasons for which new
trials have heretofore been granted in actions at law in the
courts of the United States . . . ."  Fed. R. Civ. P. 59(a).  A
court should grant a new trial where the verdict is contrary to

the weight of the evidence and a miscarriage of justice would result if the verdict were to stand.  Brennan v. Norton, 350 F.3d 399, 430 (3d Cir. 2003) (citing Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991)).  However, where the ground for a new trial is that the jury's verdict was against the weight of the evidence, the court should proceed cautiously, because such a ruling would necessarily substitute the court's judgment for that of the jury.  Klein v. Hollings, 992 F.2d 1285, 1290 (3d Cir. 1993).  A motion for a new trial should also be granted where substantial error occurred in admission or rejection of evidence.  Goodman v. Pennsylvania Turnpike Comm'n, 293 F.3d 655, 676 (3d Cir. 2002).

      B.   <u>Whether Mary Kay Properly Preserved Its Objection To The Scope Of Dr. Weiner's Testimony</u>

Mary Kay contends that the Court should grant its Motion For A New Trial because Dr. Weiner, Tristrata's expert, testified to matters beyond the scope of his expert report.  (D.I. 323 at 5.)  Specifically, Mary Kay objects to Dr. Weiner's testimony with respect to the "flux equation" and "permeation enhancers," (Tr. 257-61, 267-69), and emulsifiers acting as permeation enhancers, (Tr. 266-70).  (D.I. 323 at 6.)  However, Mary Kay did not object to this testimony at trial and has therefore waived this objection.  Waldorf v. Shuta, 142 F.3d 601, 629 (3d Cir. 1998).  Mary Kay cites the Court's policy of deciding such objections post-trial.  (D.I. 323 at 5-6.)  That policy does not, however,

eliminate the requirement for making a timely objection at trial.

    C.  <u>Whether The Court Properly Admitted Tristrata's
Evidence That All Wrinkles Are Dermal</u>

Mary Kay also contends that it should be granted a new trial
because the Court erred in permitting Tristrata witnesses to
testify that all wrinkles are dermal.  Mary Kay argues that a
statement in Tristrata's response (D.I. 146) to Mary Kay's Motion
For Summary Judgment Of Invalidity (D.I. 133) amounted to a
judicial admission that "wrinkles are capable of being
epidermal," and that the Court should have precluded Tristrata
from presenting contrary evidence.  (D.I. 323 at 10.)  That
statement reads:

> [Tristrata] maintains that lay consumers do not
> necessarily understand the term "wrinkle" to refer to,
> "A ridge or furrow in the skin associated with
> degenerative changes in the dermis."  Instead, lay
> consumers lump "wrinkles" and "fine lines" together
> into a group that includes both ridges and furrows
> caused by dermal degeneration and ridges and furrows
> caused by decidedly superficial/epidermal
> irregularities (dryness, cracking, irregular
> exfoliation, etc.).

(D.I. 146, ¶ 29.)

Judicial admissions are binding for the purpose of the case
in which the admissions are made.  <u>Glick v. White Motor Co.</u>, 458
F.2d 1287, 1291 (3d Cir. 1987).  "However, to be binding,
judicial admissions must be unequivocal."  <u>Id.</u> (citing <u>Oscanyan
v. Arms Co.</u>, 103 U.S. 261 (1880)).  The Court concludes that
Tristrata's statement is not an unequivocal admission that

"wrinkles are capable of being epidermal," but rather an assertion about how consumers understand the term "wrinkle." Therefore, the Court did not err by allowing Tristrata to present evidence that all wrinkles are dermal.

      D.   <u>Whether The Court Properly Refused Mary Kay's Request To Instruct The Jury That The Court's Construction Of The Claim Term "Wrinkle" Did Not Apply To Other Uses Of The Word</u>

Mary Kay further contends that the Court erred in not instructing the jury that the construction of "wrinkle" given by the Court for the purpose of defining what the patent claims mean "was not intended to alter the meaning usually give that term." (D.I. 323 at 8.)  The Court's instruction on claim construction stated, in pertinent part:

> It is the Court's duty under the law to define what the patent claims mean.  I have made my determinations and I will now instruct you on the meaning of each claim. You must use the meaning that I give you for each patent claim to decide if the claim is infringed or invalid. . . . I have defined certain terms of the . . . patents as follows: The term "wrinkle" means "a ridge or furrow in the skin associated with degenerative changes in the dermis. . . ."

(D.I. 292 at 7.)  Mary Kay proposed that the Court also instruct the jury as follows:

> My definitions of the claim terms, however, do not alter the meaning of those terms as they are used by you in your own personal experience or how others use those terms including as those terms are understood by consumers or used in commercial advertising, scientific publications consumer publications or books.  My

20

> determination of what the claim terms mean applies only
> to what those terms mean in the patent claims.

(D.I. 289 at 3.)  The Court declined to issue that instruction.

Mary Kay argues that its proposed instruction was necessary
to avoid confusing the jury with respect to the difference
between the Court's definition of the word "wrinkle" for claim
construction purposes and other possible understandings of the
word.  In support of this argument, Mary Kay asserts that
although it "strived to present the other side of that story, it
was impossible to do so." (D.I. 323 at 8.)  The Court cannot
agree with that assertion.

Mary Kay presented extensive evidence in support of its
position on the varying meanings of the word "wrinkle."  Mary Kay
elicited testimony on the issue in its direct examinations of Dr.
Zoe Draelos (Tr. 658:8-659:15), Dr. Walter Smith (Tr. 1135:12-
16), Dr. Lynn Drake (Tr. 1285:18-1290:9), and Ms. Barbara Green
(Tr. 1110:8-1111:5), and in its cross examinations of Dr. Ruey Yu
(Tr. 170:5-172:11), Dr. Eugene Van Scott (Tr. 769:7-772:14), and
Dr. Richard Wildnauer (Tr. 845:3-846:4).  Mary Kay also discussed
the issue in its opening and closing arguments.  (Tr. 95:5-98:4,
1524:12-1529:8.)  The meaning of the word "wrinkle" and how it is
interpreted in various contexts other than the claims at issue
were central factual issues in this case.  Mary Kay had the
opportunity at trial to present its side of the issue and did so.
Therefore, the Court concludes that an additional jury

21

instruction on the issue was not necessary, and it was not error
to refuse Mary Kay's proposed instruction.

    E.  <u>Whether The Damages Should Be Remitted</u>

Mary Kay contends that the damages awarded by the jury are
excessive and should be remitted.  (D.I. 323 at 11.)  Mary Kay
bases this contention on the theory that its products containing
retinoids or salicylic acid should not have been included in the
damages analysis because "the evidence does not support
infringement by the accused products because each of them
included a retinoid and/or salicylic acid."  (<u>Id.</u> at 12.)  This
is essentially the same argument that the Court considered and
rejected in section I.C.2. above.  Having concluded that the
evidence sufficiently supported the jury's findings on
infringement, the Court cannot conclude that the damages are
excessive or that remittitur is warranted.

**IV.  Tristrata's Motion For Permanent Injunction (D.I. 307)**

By its Motion, Tristrata requests the Court to issue a
permanent injunction enjoining Mary Kay from further infringement
of the patents-in-suit.  (D.I. 307 at 1.)  Tristrata's proposed
injunction order would also enjoin Mary Kay from "making, using,
selling, or offering to sell the products adjudged to have
infringed the Tristrata Patents."  (<u>Id.</u>, Proposed Order.)  Mary
Kay contends that a permanent injunction is not appropriate and
that Tristrata's proposed injunction order is impermissibly vague

and overbroad.

Pursuant to 35 U.S.C. § 283, the Court has discretion to grant injunctive relief. However, "[b]ecause the 'right to exclude recognized in a patent is but the essence of the concept of property,' the general rule is that a permanent injunction will issue once infringement and validity have been adjudged." MercExchange, LLC v. eBay, Inc., 401 F.3d 1323, 1338 (Fed. Cir. 2005) (quoting Richardson v. Suzuki Motor Co., 868 F2d 1226, 1246-47 (Fed. Cir. 1989)). In support of its contention that a permanent injunction is not appropriate, Mary Kay offers the following arguments: (1) Mary Kay has not sold the accused products for nearly two years; (2) there is no risk that Mary Kay will act willfully to infringe in the future; (3) Tristrata has adequate legal remedies for future infringement; and (4) the asserted claims are invalid. (D.I. 316 at 3-5.) None of these arguments is sufficient to justify denial of a permanent injunction in the context of a patent infringement case.

With respect to Mary Kay's first argument, the Federal Circuit has held that "[t]he fact that the defendant has stopped infringing is generally not a reason for denying an injunction against future infringement unless the evidence is very persuasive that further infringement will not take place." W.L. Gore & Associates, Inc. v. Garlock, Inc., 842 F.2d 1275, 1282 (Fed. Cir. 1988). Mary Kay has not provided the Court with such

evidence.  To the extent that the second argument differs from the first, Mary Kay provides no authority for the proposition that willful infringement is a prerequisite for a permanent injunction.  Mary Kay's third argument ignores the general rule articulated in <u>MercExchange</u>, that a permanent injunction will issue once infringement and validity have been proven, and provides no basis for an exception to that rule.  Finally, the jury found that Mary Kay did not prove that the asserted claims are invalid, and the Court has concluded that the jury's finding had sufficient evidentiary support.  Therefore, the Court will grant Tristrata's Motion For Permanent Injunction (D.I. 307).

Mary Kay contends that the injunction order proposed by Tristrata is overbroad because it would preclude Mary Kay from making, selling, or offering to sell products when the jury found only that method claims were infringed.  (D.I. 316 at 5.)  Mary Kay also contends that Tristrata's proposed injunction order is vague because it does not meet the specificity required by Federal Rule of Civil Procedure 65(d).  (<u>Id.</u> at 9.) Rule 65(d) states:

> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in

24

> active concert or participation with them who receive
> actual notice of the order by personal service or
> otherwise.

Fed. R. Civ. P. 65(d).  The Court will craft its injunction order

to avoid overbreadth and to comply with the specificity required

by Rule 65(d).

## V.  Tristrata's Motion For Entry Of Final Judgment (D.I. 309)

By its Motion, Tristrata requests that the Court enter final

judgment in its favor, pursuant to Federal Rule of Civil

Procedure 58(d), with both prejudgment interest and postjudgment

interest.  (D.I. 309 at 1.)  Because the jury returned a special

verdict in favor of Tristrata and the Court has concluded that

Mary Kay's Motions For Judgment As A Matter Of Law and For A New

Trial should be denied, the Court will grant Tristrata's Motion

For Entry Of Final Judgment.  The Court will award postjudgment

interest pursuant to 28 U.S.C. § 1961.

Mary Kay contends that the Court should deny prejudgment

interest or at least limit the period for which it is calculated,

because Tristrata was responsible for undue delay in prosecuting

this lawsuit.  (D.I. 317 at 2.)  In cases of patent infringement,

"prejudgment interest should be awarded under [35 U.S.C.] § 284

absent some justification for withholding such an award."

General Motors Corp. V. Devex Corp et al., 461 U.S. 648, 657

(1983).  One such justification is the patent owner's undue delay

in prosecuting the lawsuit.  Id.  However, unless that delay

causes prejudice to the defendant, it does not support a denial of prejudgment interest. <u>Lummus Industries, Inc., v. D. M.& E. Corp.</u>, 862 F.2d 267, 275 (Fed. Cir. 1988).

The Court concludes that Mary Kay was not prejudiced by any delay attributable to Tristrata. Mary Kay cannot dispute that, at least as early as 1994, it had notice of Tristrata's patents, was concerned about potential infringement by Mary Kay products, and took steps to position itself to defend against a patent infringement lawsuit. Tristrata presented extensive documentary evidence to that effect at trial. (<u>See</u> PTX 53, 55, 62, 105, 107, 111, 114, 115, 124, 125, 126, 128, 149) In light of that evidence, the Court finds unpersuasive Mary Kay's assertion that, had Tristrata filed suit earlier, Mary Kay would have altered its products or advertising claims, avoiding liability for royalty payments. Therefore, the Court concludes that prejudgment interest is warranted, calculated from February, 1995 until the date of this Court's Final Judgment Order.[5]

The parties differ over the rate at which prejudgment interest should be calculated. Tristrata argues for the prime lending rate, compounded quarterly, while Mary Kay argues for a "risk-free" rate based on the 3-Month Treasury Bill and simple interest. The purpose of awarding prejudgment interest is "to

---

[5] Both parties base their calculations on hypothetical royalty payments beginning in February, 1995. (D.I. 311, Ex. 3; D.I. 318 Ex. S1.)

ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." General Motors, 461 U.S. at 655.  The rate of prejudgment interest is within the discretion of the Court. See Studiengesellschaft Kohle, m.b.H. v. Dart Industries, Inc., 862 F.2d 1564, 1580 (Fed. Cir. 1988).  Based on the terms of agreements between Tristrata and other companies to license the patents-in-suit (PTX 237, 242, 264), the Court concludes that, to fully compensate Tristrata for the loss of use of reasonable royalty payments, prejudgment interest should be calculated at the prime rate compounded quarterly.

CONCLUSION

In sum, for the reasons discussed, the Court will deny Mary Kay's Rule 50(a) Motion For Judgment As A Matter Of Law At The Close Of All The Evidence (D.I. 290), Mary Kay's Rule 50(b) Post-Trial Motion For Judgment As A Matter Of Law (D.I. 324), and Mary Kay's Rule 59 Motion For New Trial Filed As An Alternative To Its Renewed Motion For Judgment As A Matter Of Law (D.I. 322).  The Court will grant Tristrata's Motion For Permanent Injunction (D.I. 307) and Motion For Entry Of Final Judgment (D.I. 309).

Appropriate orders will be entered.

27